

GARY VICTOR DUBIN 3181
LONG H. VU 8840
FREDERICK J. ARENSMEYER 8471

Dubin Law Offices
Suite 3100, Harbor Court
55 Merchant Street
Honolulu, Hawaii 96813

Telephone: (808) 537-2300
Facsimile: (808) 523-7733
Email: gdubin@dubinlaw.net
Email: lvu@dubinlaw.net
Email: farensmeyer@dubinlaw.net

Attorneys for Plaintiff
Helen Goodnight

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

2009 JUN 25 AM 11: 25

H. CHING
CLERK

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

## STATE OF HAWAII

| | |
|---|---|
| HELEN GOODNIGHT,<br><br>          Plaintiff,<br><br>vs.<br><br>FIRST MAGNUS FINANCIAL CORPORATION, an Arizona corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, a Delaware corporation; RANDALL W. HAZARD; GOLD COAST MORTGAGE, LLC, a Hawaii limited liability company; THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATE HOLDERS CWABS, INC. ASSET-BASED CERTIFICATES SERIES 2006-23, a New York corporation; and DOES 1-30,<br><br>          Defendants. | CIVIL NO. 09- 1-1458-06   B I A<br>(Declaratory Judgment)<br><br>COMPLAINT FOR DECLARATORY JUDGMENT AS TO TITLE, FOR INJUNCTIVE RELIEF, AND FOR ACTUAL AND PUNITIVE DAMAGES; EXHIBITS 1 THROUGH 9; DEMAND FOR TRIAL BY JURY; SUMMONS |

## COMPLAINT FOR DECLARATORY JUDGMENT AS TO TITLE, FOR INJUNCTIVE RELIEF, AND FOR ACTUAL AND PUNITIVE DAMAGES

I do hereby certify that this is a full, true and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

# EXHIBIT A

COMES NOW Plaintiff HELEN GOODNIGHT ("GOODNIGHT"), by and through her undersigned attorneys, and for her Complaint against Defendants FIRST MAGNUS FINANCIAL CORPORATION ("FIRST MAGNUS"), MORTGAGE ELECTRONIC REGISTRATION SYSTEMS ("MERS"), RANDALL W. HAZARD ("HAZARD"), GOLD COAST MORTGAGE, LLC ("GOLD COAST"), THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATE HOLDERS CWABS, INC. ASSET-BASED CERTIFICATES SERIES 2006-23 ("BONY"), and DOES 1-30, ("DOES"), alleges and avers as follows:

### Jurisdiction and Venue

1. This Complaint is filed in part (a) pursuant to various Hawaii consumer deceptive and unfair acts and practices prohibitions codified in Chapter 480 of the Hawaii Revised Statutes, (b) pursuant to the written contractual agreements specified herein below, (c) pursuant to the Federal Truth-In-Lending Act, Section 1601, as amended, *et seq.*, of Title 15 of the United States Code, (d) pursuant to Section 632-1 of the Hawaii Revised Statutes, (e) pursuant to common law doctrines proscribing fraudulent conduct, and (f) pursuant to Rule 57 of the Hawaii Rules of Civil Procedure.

2. Venue is proper in this Circuit Court, where the majority of the Defendants have maintained their offices and/or have conducted their business in the State of Hawaii.

### The Parties

3. Goodnight, at all times relevant hereto, was and is a resident of the County of Hawaii in the State of Hawaii, the owner of residential real property ("subject property") located at 68-1884 E. Kaupapa Place, Waikoloa, Hawaii 96738, the legal description of which is set forth in Exhibit 1 attached hereto, its contents incorporated herein by this reference.

2

4. First Magnus purports to be an Arizona corporation, headquartered in Tucson in the State of Arizona, doing business throughout the State of Hawaii (therein principally in the City and County of Honolulu), and was Goodnight's original lender as explained below.

5. MERS purports to be a Delaware corporation, headquartered in Flint in the State of Michigan, doing business throughout the State of Hawaii (therein principally in the City and County of Honolulu), Goodnight's original mortgagee as explained below.

6. Hazard, at all times relevant hereto, was and is believed to be a resident of the County of Hawaii in the State of Hawaii, and the Manager and Owner of Gold Coast, a licensed Hawaii mortgage brokerage firm as explained below.

7. BONY purports to be MERS/First Magnus's assignee and Goodnight's most recent mortgagee, headquartered in Plano in the State of Texas doing business throughout the State of Hawaii (therein principally in the City and County of Honolulu), and the successful bidder at the nonjudicial foreclosure sale as explained and as described below.

8. Goodnight believes, and based upon such belief, further alleges and avers that there are other individuals, groups, and/or entities, including agents, servants, employers, employees, partners, associates, lenders, loan officers, appraisers, notaries, co-venturers, joint venturers, shareholders, attorneys, accountants, and/or assistants of said already named Defendants, sued herein as Does, who are also partially responsible for the injuries, damages, and harm hereinbelow complained of, whose true identities and capacities are not yet known to Goodnight and to her attorneys, or whose involvement in same has not yet been identified by her and her attorneys; and leave of Court will be requested to add same as additional named Defendants herein at such time as their true identities and capacities and participation in same may become known.

3

### The Facts

9. On or about October 10, 2006, Goodnight individually obtained a mortgage loan on her residential real property, located at 68-1884 E. Kaupapa Place, Waikoloa, Hawaii 96738, in the amount of $515,700 from her original lender, First Magnus Financial Corporation ("First Magnus").

10. Said 2006 Note, a true and correct copy of which is set forth in Exhibit 2 attached hereto, makes no mention of First Magnus having a "power of sale" over her mortgaged property in the event of default.·

11. Said 2006 Mortgage, a true and correct copy of which is set forth in Exhibit 3, states in its beginning, unnumbered paragraph on its page three commencing following clause (Q), that "Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property," and thereafter in its Paragraph 22 states that "if the default is not cured . . . Lender   . . . may invoke the power of sale and any other remedies permitted by Applicable Law."

12. At the time that Goodnight entered into said mortgage loan in 2006, she was required to sign said Note and said Mortgage – provided to her by First Magnus and by its Mortgage Broker, Gold Coast through Hazard, the purported Manager of Gold Coast, both licensed by the State of Hawaii -- without being allowed adequate time to read and to understand the terms and the language of same, which were not explained to her, and nowhere in said Note or said Mortgage is the phrase "power of sale" explained, and nowhere in said Note or said Mortgage is the effect of said phrase "power of sale" explained.

13. When she was requested by Hazard to come to her office to sign the loan closing papers for First Magnus on or about October 10, 2006, she discovered for the first time that the terms promised to her were changed; whereas she had been

4

promised lower terms and a fixed mortgage interest rate amortized over thirty years, the loan papers presented to her at closing listed a higher interest rate and adjustable terms.

14. Goodnight protested to Hazard that she had been lied to, as a result of which he informed her that he would correct the mistakes, but that meanwhile she should sign the loan documents as erroneously prepared by First Magnus and that he would make up the difference, assuring her that she would have the fixed interest rate of 6.350% as promised, and that he would replace the First Magnus loan with a mortgage loan from the Bank of America within 75 days at no cost to her.

15. Hazard then provided her with a signed letter dated October 10, 2006, acknowledging the mistake and promising her that he would correct the error at no cost to her if she first signed the erroneous loan documents, a true and correct copy of which letter is set forth in Exhibit 4 attached hereto.

16. Had Goodnight not received said promise and said letter, she would not have signed off on the erroneous terms of the First Magnus mortgage loan.

17. Relying upon said promise and said letter, Goodnight signed the erroneous loan documents that day, as a result of which the loan closed, as shown by the true and correct copy of the Settlement Statement, set forth in Exhibit 5 attached hereto, evidencing that both Gold Coast and First Magnus received thousands of dollars in fees, including a yield spread premium paid by First Magnus to Gold Coast presumably for having placed her in a higher interest-rate loan than she had agreed to.

18. Gold Coast proceeded for approximately nine or ten months to pay her the difference between the terms of what she had been promised and what was on the closing loan papers, and then suddenly stopped paying her the difference, and Hazard thereafter has never returned her telephone calls.

19. After Goodnight receiving word that the BONY had, as purported foreclosing mortgagee, scheduled a nonjudicial auction of her property set for September 25, 2008 (eventually purportedly postponed until November 21, 2008), as set forth in Exhibit 6

attached hereto, Goodnight finally found an attorney knowledgeable in this area of the law who on September 24, 2008 sent a written notification to First Magnus, MERS, Countrywide Home Loans who was servicing the loan, and BONY on her behalf, a true and correct copy of which letter is set forth in Exhibit 7 attached hereto, stating that under the circumstances as a matter of law the subject mortgage loan was null and void, having been procured by fraud in the inducement, demanding that all wrongful foreclosure actions cease and that she be paid damages and that the title to her property be protected against further slander and foreclosure threats.

20. On or about March 10, 2009, Goodnight was served with a Complaint for Ejectment and a Summons by BONY, as set forth in Exhibit 8 attached hereto, which had been the purported foreclosing mortgagee, the auctioneer, and the high bidder at said nonjudicial auction, and to whom title to her property had been allegedly transferred by BONY to BONY by Quitclaim Deed, as set forth in Exhibit 9 attached hereto.

21. Goodnight was required to appear in State District Court, BONY alleging that it had title to her property *via* a public sale conducted without her consent, demand having been made earlier on her to vacate the property which she refused to do, BONY seeking to eject her and her family from her home even though she has had title to the subject property since 2006, no Court has yet approved BONY's attempt to take title from her, and said attempted Section 667-5 nonjudicial foreclosure sale was void as the byproduct of documented mortgage fraud.

22. Goodnight defended in State District Court, and that case is in the process of being dismissed.

23. Each and every allegation in each and every Paragraph above is hereby realleged and incorporated within each and every Paragraph below.

### COUNT ONE:
**Declaratory Judgment Re:
Title to the Subject Property
Against BONY**

24.  Goodnight seeks a declaratory judgment that said nonjudicial foreclosure action and subsequent transfer of title by BONY to BONY is void and unenforceable as procured by mortgage fraud in violation of federal and state law, effected by deceit and misrepresentation, and by exercising a "power of sale" clause in her adhesive 2006 Mortgage that violates Goodnight's due process rights under both the United States and Hawaii State Constitutions, entitling her to have said title transfer to BONY set aside and actual damages, including attorneys' fees and costs and including from and against Does once identified, as found to be appropriate upon the trial of this case.

### COUNT TWO:
**Declaratory Judgment Re:
Fraud and Rescission and Common Law Damages
Against First Magnus, MERS, and BONY**

25.  Goodnight seeks a declaratory judgment that said 2006 Note and said 2006 Mortgage and as may have been assigned are void and unenforceable as procured by deceit and misrepresentation, with entitlement to actual damages, including attorneys' fees and costs and including against Does once identified, as found to be appropriate upon the trial of this case.

### COUNT THREE:
**Declaratory Judgment Re:
Chapter 480 HRS Rescission and Treble Damages
Against First Magnus, MERS, Hazard, Gold Coast, and BONY**

26.  Goodnight seeks a declaratory judgment that said 2006 Note and said 2006 Mortgage and as may have been assigned are void and unenforceable, the acts complained of above constituting unfair and deceptive acts and practices against consumers, as defined and proscribed in Chapter 480 of the Hawaii Revised Statutes, entitling her to rescission as against First Magnus and MERS and any and all

7

subsequent assignees pursuant to Section 480-12 and to actual and to treble damages against First Magnus, Hazard, and Gold Coast, including attorneys' fees and costs and including against Does once identified, pursuant to Section 480-13 of the Hawaii Revised Statutes.

## COUNT FOUR:
### Injunctive Relief
### Against BONY

27. Goodnight seeks injunctive relief, preventing BONY and/or any assignee and/or any successor-in-interest of its from further transferring said title to her property, from further damaging her finances, from further placing a cloud upon her title to the subject property, and from further injuring her credit, entitling her to the issuance of a temporary restraining order, a preliminary injunction, and a permanent injunction against BONY and any Doe Defendant of its from in any way participating in the transfer of title to the subject property, and an award of actual damages, including attorneys' fees and costs and including against Does once identified, against and because of any such threatened title transfer.

## COUNT FIVE:
### Declaratory Judgment Re:
### TILA Statutory Damages
### Against First Magnus, MERS, and BONY

28. Goodnight seeks a declaratory judgment that said 2006 Note and said 2006 Mortgage and as may have been assigned, as a result of said mortgage fraud, violate the Federal Truth-In-Lending Act, Section 1601, as amended, *et seq*., of Title 15 of the United States Code, and that therefore Goodnight is entitled to statutory damages, as well as her actual damages, including attorneys' fees and costs and including against Does once identified, as appropriate pursuant to Section 1640(a) of Title 15 of the United States Code.

### COUNT SIX:
**Breach of Fiduciary Duty**
**Against Hazard and Gold Coast**

29. Goodnight seeks a declaratory judgment that said 2006 Note and said 2006 Mortgage were the result of mortgage fraud committed by Hazard and Gold Coast while in a fiduciary relationship of trust, confidence, and superior knowledge with her, upon whose representations aforesaid she relied while in such fiduciary relationship, which Hazard and Gold Coast breached through dominance, duress, dependence, and/or manipulation, entitling Goodnight to an award of her actual damages, including attorneys' fees and costs.

### COUNT SEVEN:
**Malicious Prosecution Damages**
**Against BONY**

30. The State District Court proceedings aforesaid, initiated by BONY, are in the process of being terminated through dismissal, and were initiated without probable cause with legal malice against Goodnight who has suffered and will continue to suffer damages and injury to her health and her personal and business relationships, due to sleeplessness, nausea, headaches, panic attacks, loss of productivity, anxiety, depression, insecurity, and defamation, in an exact amount of actual damages to be determined and awarded according to proof at trial, including her costs of suit in said proceedings including this action, her attorneys' fees and costs in said proceedings including this action, the resulting emotional and physical distress that she has accordingly suffered and sustained, and all resultant and consequential damages.

### COUNT EIGHT:
**Punitive Damages**
**Against First Magnus, Hazard, Gold Coast, and BONY**

31. The acts complained of above, waged against Goodnight by First Magnus, Hazard, Gold Coast, and BONY, both independently and conspiratorially as the

9

evidence at trial may show, constituting mortgage fraud and/or constituting unfair and deceptive acts and practices and/or constituting malicious prosecution, were done in a wanton, willful, intentional, and/or reckless manner, in complete criminal disregard of the finances and feelings of Goodnight and her family and/or in violation of the criminal laws of the State of Hawaii and the criminal laws of the United States of America, for which Goodnight is entitled to an award of punitive and exemplary damages in a multiple of at least ten times her actual damages and including against Does once identified, to be determined in accordance with her proof at trial.

### Prayer For Relief

WHEREFORE, Plaintiff Helen Goodnight prays that she have Judgment against all Defendants, individually and/or jointly and severally, as this Court may determine to be just, as pled, reserving her right to seek to have this action converted into a class action should the evidence subsequently adduced in discovery show that the harm done to her represents a general pattern of unlawful and predatory practices similarly waged against other borrowers in this State and elsewhere, as follows:

A. For Declaratory Judgment Re: Title to the Subject Property Against BONY;

B. For Declaratory Judgment Re: Fraud and Rescission and Common Law Damages Against First Magnus, MERS, and BONY;

C. For Declaratory Judgment Re: Chapter 480 HRS Rescission and Treble Damages Against First Magnus, MERS, Hazard, Gold Coast, and BONY;

D. For Injunctive Relief Against BONY;

E. For Declaratory Judgment Re: Statutory Damages Against First Magnus, MERS, and BONY;

F. For Breach of Fiduciary Duty Against Hazard and Gold Coast;

G. For Malicious Prosecution Against BONY;

H. For Punitive Damages Against First Magnus, Hazard, Gold Coast, and BONY;

I. For Costs of Suit -- in an amount to be decided by the Court;

J. For Attorneys' Fees — in an amount to be determined by statute and/or decided by the Court and/or by the Jury; and

K. For Such Other and Further Relief — as deemed just and proper by this Court.

DATED: Honolulu, Hawaii; June 25, 2009.

GARY VICTOR DUBIN
LONG H. VU
FREDERICK J. ARENSMEYER
Attorneys for Plaintiff
Helen Goodnight

Exhibit #1

## EXHIBIT A

THE LAND REFERRED TO IN THIS GUARANTEE IS SITUATED IN THE STATE OF HAWAII, COUNTY OF HAWAII, CITY OF WAIKOLOA, AND IS DESCRIBED AS FOLLOWS:

ALL OF THAT CERTAIN PARCEL OF LAND SITUATE AT WAIKOLOA, DISTRICT OF SOUTH KOHALA, ISLAND AND COUNTY OF HAWAII, STATE OF HAWAII, BEING LOT 34, AREA 10,607 SQUARE FEET, MORE OR LESS, OF THE "WAIKOLOA VILLAGE UNIT 1-B", AS SHOWN ON THE MAP THEREOF FILED IN THE OFFICIAL RECORDS AS FILE PLAN NO. 1189.

BEING ALL OF THE PREMISES CONVEYED BY WARRANTY DEED RECORDED OCTOBER 13, 2006 AS REGULAR SYSTEM DOCUMENT NO. 2006-187331 OF OFFICIAL RECORDS,
GRANTOR: ARMAND GALLEGOS, HUSBAND OF JULIE GALLEGOS
GRANTEE: HELEN GOODNIGHT, WIFE OF JAMES GOODNIGHT

Exhibit #2

# InterestOnly ADJUSTABLE RATE NOTE

(One-Year LIBOR Index (As Published in *The Wall Street Journal*) - Rate Caps)

MIN: 100039257421600247
MERS Phone: 1-888-679-6377

LOAN NO.:  5742160024

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| OCTOBER 10, 2006 | HONOLULU | HAWAII |
|---|---|---|
| [Date] | [City] | [State] |

68-1884 E. KAUPAPA PLACE, WAIKOLOA, HI 96738
[Property Address]

**1.      BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $   515,700.00   (this amount is called "Principal"), plus interest, to the order of Lender.  The Lender is
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.      INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of      7.250      %.  The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.      PAYMENTS**

(A) Time and Place of Payments

I will make a payment every month.  I will make my monthly payment on the      1st      day of each month beginning on     DECEMBER, 2006     .  This payment will be for interest only for the first   36    months ("Interest Only Period"), and thereafter my payments will consist of Principal and interest.  I will make my payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this note.

Each monthly payment will be applied as of its scheduled due date, and if the payment includes both Principal and interest it will be applied to interest before Principal.  If, on   NOVEMBER 01, 2036   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION
603 North Wilmot Road, TUCSON, AZ  85711
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $      3,115.69      .  This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

4.      **ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of NOVEMBER, 2009 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market (LIBOR), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE QUARTER percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.250 % or less than 5.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 13.250 % or less than 2.250 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both Principal and interest on this Note (the "First Principal and Interest Payment Due Date") will be the first monthly payment date after the expiration date of the Interest Only Period.

**5.      BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A prepayment of all the unpaid principal is known as a "Full prepayment." A prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

If I make a Partial Prepayment equal to one or more of my monthly payments, my due date may be advanced no more than one month. If I make any other Partial Prepayment, I must still make each later payment as it becomes due and in the same amount. I may make a Full or a Partial Prepayment at any time.

XX☒      If this box is checked, no prepayment penalty will be charged on this loan.

☐      If this box is checked, I have selected a loan which has a prepayment penalty. The Prepayment Penalty Addendum attached hereto and made a part hereof defines the terms of the prepayment penalty. I understand that by agreeing to pay a prepayment penalty I acknowledge that my interest rate and/or fees are lower than they would be without a prepayment penalty.

**6.      LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.      BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of          15          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          5.000          % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.      GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

(A)  UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

I understand that for the Interest Only Period my monthly payments will not reduce the Principal balance on my loan. My monthly payments after the Interest Only Period will consist of both Principal and interest and will be higher unless I have made additional payments to reduce the Principal balance.


HELEN GOODNIGHT _____(Seal)        _____(Seal)
                                -Borrower                                   -Borrower


_____(Seal)       _____(Seal)
                                -Borrower                                   -Borrower


_____(Seal)       _____(Seal)
                                -Borrower                                   -Borrower


_____(Seal)       _____(Seal)
                                -Borrower                                   -Borrower


                                                              [Sign Original Only]

Conv
® MULTISTATE InterestOnly ADJUSTABLE RATE NOTE - ONE YEAR LIBOR INDEX
FE-4265 (0603)                    Page 6 of 5

Assessor's Parcel Number:
(3) 6-8-006-029
After Recording Return To:
FIRST MAGNUS FINANCIAL CORPORATION

603 N. WILMOT
TUCSON, AZ 85711

Prepared By:

FIRST MAGNUS FINANCIAL CORPORATION
603 N. WILMOT
TUCSON, AZ 85711

LOAN NO.:  5742160024

MIN: 100039257421600247
MERS Phone: 1-888-679-6377

---

[Space Above This Line For Recording Data]

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 10th day of      OCTOBER, 2006
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to
secure Borrower's Fixed/Adjustable Rate Note (the "Note") to
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:
68-1884 E. KAUPAPA PLACE, WAIKOLOA, HI 96738
[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN
ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S
ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM
RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of      7.250      %.  The Note also provides
for a change in the initial fixed rate to an adjustable interest rate, as follows:

Conv
● MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY                                                          Initials:_____
FE-4266  (0603)                   Page 1 of 4      LENDER SUPPORT SYSTEMS, INC. COU-4266.COU (04/06)

**4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of NOVEMBER, 2009     , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.  The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my adjustable interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for one year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index".
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND ONE QUARTER                      percentage points (   2.250      %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than  9.250  % or less than 5.250 %.  Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months.  My interest rate will never be greater than  13.250  % or less than   2.250   %.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change.  The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
   1.  UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:

   Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   2.  AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:

   Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

   To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Conv
• MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
FE-4266  (0603)                      Page 3 of 4                        Initials:_____

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

**I understand that for the Interest Only Period my monthly payments will not reduce the Principal balance on my loan. My monthly payments after the Interest Only Period will consist of both Principal and interest and will be higher unless I have made additional payments to reduce the Principal balance.**

HELEN GOODNIGHT _____ (Seal)          _____ (Seal)
                                 -Borrower                        -Borrower

_____ (Seal)          _____ (Seal)
                 -Borrower                        -Borrower

_____ (Seal)          _____ (Seal)
                 -Borrower                        -Borrower

_____ (Seal)          _____ (Seal)
                 -Borrower                        -Borrower

Conv
 • MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
FE-4266  (0603)                        Page 4 of 4

# PLANNED UNIT DEVELOPMENT RIDER

LOAN NO.: 5742160024

MIN: 100039257421600247
MERS Phone: 1-888-679-6377

THIS PLANNED UNIT DEVELOPMENT RIDER is made this            10th            day of
OCTOBER, 2006     , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the
same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at:

68-1884 E. KAUPAPA PLACE, WAIKOLOA, HI 96738
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described in

COVENANTS, CONDITIONS AND RESTRICTIONS.
(the "Declaration"). The Property is a part of a planned unit development known as
WAIKOLOA VILLAGE

[Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the
"Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners
Association; and (iii) any by-laws or other rules or regulations of the Owners Association.
Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the
Constituent Documents.

Initials:_____

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01
V-7R (0411).01                    Page 1 of 3           LENDER SUPPORT SYSTEMS INC. 7R.NEW (07/06)

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become

V-7R (0411).01                    Page 2 of 3                    Initials:_____
                                                                Form 3150 1/01

additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

HELEN GOODNIGHT _____ (Seal)          _____ (Seal)
                                  -Borrower                                  -Borrower

_____ (Seal)                  _____ (Seal)
                         -Borrower                                  -Borrower

_____ (Seal)                  _____ (Seal)
                         -Borrower                                  -Borrower

_____ (Seal)                  _____ (Seal)
                         -Borrower                                  -Borrower

V-7R (0411).01                  Page 3 of 3                  Form 3150 1/01